IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

JAMES C. GAINES,

        Petitioner,                No. CIV S-10-1716 KJM CHS

    vs.

M.D. McDONALD, Warden,

        Respondent.

FINDINGS AND RECOMMENDATIONS

_____/

## I.  INTRODUCTION

James C. Gaines, a state prisoner, proceeds pro se with a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254.  At issue is Gaines's 2007 conviction for the 1972 murder of 12-year-old Shannon Ritter.

## II.  FACTUAL AND PROCEDURAL BACKGROUND

A cold case for more than three decades, the investigation of Ritter's murder was reopened in 2006 when Gaines's DNA was identified on a cigarette butt taken from the apartment where the murder took place.  The California Court of Appeal set forth a detailed summary of the facts of the murder and the subsequent investigation which culminated years later in Gaines's arrest and conviction.

**The murder of Shannon Ritter**

On the evening of September 29, 1972, Margie Doporto hired Shannon Ritter to babysit her young children at Doporto's apartment. Doporto was a young married woman who lived in the apartment complex with her four children. When Doporto's husband, who was in the military, was away, she often had male visitors.[FN3]

    FN3. Doporto died before trial.

The night Ritter babysat at Doporto's apartment, her friend, 17-year-old Mary Ellen Koone, stopped by to check on her. Ritter came to the door and told Koone "there was somebody in the house and she was very uncomfortable about it." The man had rung the doorbell and asked for Doporto. Ritter told Koone the man insisted on waiting in the apartment for Doporto to return.

Koone stepped in front of the door and saw a black male sitting on the couch, watching television. Koone had never seen the man before but guessed he was between 17 and 20 years old, of a build slighter than medium. Seated, he appeared to be about five feet three inches to five feet six inches tall.

Koone offered to have her mother come over and "run him off," but Ritter declined. Ritter said she "would be too embarrassed" if she sent him away and the man turned out to be a friend of Doporto.

Koone asked Ritter the man's name. Ritter asked the man, who responded that his name was Robert and he was a high school sophomore. Ritter asked Koone to come into the apartment, but Koone declined, saying she had to return home to check on her own baby. Koone was the last person, other than the slayer, to see Ritter alive.

A few hours later, Doporto's neighbors, Everett and Jacqueline Hipsher, were awakened by Doporto's knocking at their door. Everett walked over to Doporto's apartment and went inside. He saw water flowing down the stairs. Everett climbed the stairs and looked into the bathroom. In the tub he saw hair floating on top of the water. Everett soon realized there was a person in the water.

Deputy Sheriff Ron Goesch and his partner were dispatched to Doporto's apartment and found Ritter's body in the bathtub. Ritter was nude, lying on her left side with her face in the water near the running faucets. Rigor mortis had begun to set in.

Goesch found Doporto's children asleep in different bedrooms. They were moved to a nearby apartment prior to the deputies' searching Doporto's apartment.

In the living room, sheriff's deputies discovered Ritter's clothing piled on one end of the couch where Koone had seen the man sitting. Ritter's bra was still fastened, her underwear was inside out, a t-shirt was partially inside out, and one pant leg was wadded up. Ritter's shoes were on the floor at the other end of the couch. Both shoe soles were damp.

Sheriff's deputies found three cigarette butts next to an overturned ashtray near the shoes. Two of the cigarette butts were Salem brand. On a nearby table lay a pack of Salem cigarettes, three of which were missing. A deputy described the house as "messy" and "dirty."

The pathologist who conducted Ritter's autopsy testified Ritter died from a combination of manual strangulation and drowning. Ritter's body had been submerged long enough to develop a condition known as "skin slip," which the pathologist testified is often the result of being in hot water.

An examination of Ritter's body revealed two deep bruises on the right side of her head and abrasions on her lip, chin, and neck. The throat and neck injuries indicated Ritter had struggled while being strangled. The lip injuries could have been caused by Ritter's falling against something or being hit with something. In addition, Ritter's hyoid bone had been damaged.

The autopsy also revealed petechial hemorrhaging in the whites of Ritter's eyes, which occurs when significant pressure resulting from something tight around the neck causes tiny blood vessels to break. Petechial hemorrhaging also was present on the surface of Ritter's lungs and heart and on her chest, which, along with expanded lungs, pointed to death by drowning. The pathologist found a "frothy foam" around Ritter's mouth, another indication of drowning.

The pathologist's findings comport with Ritter's being strangled into unconsciousness and then placed in the bathtub and drowned.[FN4]

> FN4. Ritter's fingernails, which were "bitten ... down quite low," yielded no scrapings from her attacker.

The pathologist found no evidence of rape or sodomy. However, the examination of Ritter's body yielded a series of linear lesions on one breast, around the areola. The lesions were possibly created by an instrument with a small rectangular end, but not by a fingernail or tooth. The injuries had been inflicted prior to Ritter's death.

/////

3

**The Subsequent Investigation**

***Defendant's Interviews***

Defendant, 23 years old at the time of the murder, lived with his wife and three children in the same apartment complex where Ritter was killed. Defendant's apartment was across a yard from Doporto's. He was an enlisted airman assigned to a nearby United States Air Force base.

The morning after the murder, sheriff's deputies interviewed defendant. Defendant told them he spent the entire night watching his two children, leaving only once to go to the market. One of the investigating deputies noticed something she considered unusual: defendant's shirt throbbed as though his heart was beating very hard and fast.

Later that day, Koone and her father were in the laundry room at the apartment complex. Koone's father told her a man was staring at her. Koone looked at the man and realized he resembled the man she had seen the night before with Ritter. That afternoon, Koone identified defendant in a photographic lineup as the man in Doporto's apartment the night of the murder. The lineup was composed of photographs of eight individuals.

Sheriff's deputies again interviewed defendant. After waiving his *Miranda* rights,[FN5] defendant offered a different version of his movements the night of the murder. Defendant stated he dropped off his wife and one child at the bus station. He remained at home with the other two children. After putting them to bed, he went to a store near the apartment complex and was cited for shoplifting a bottle of liquor.

> FN5. *Miranda v. Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694] (*Miranda* ).

Later, he tried to go to the noncommissioned officers club for a drink but was turned away. He returned home and checked on the two children. He then went to an apartment in the same complex to visit a friend. The friend was not home and defendant returned to his apartment. Defendant took a shower and went to bed.

Defendant denied having been in Doporto's apartment the night of the murder. However, a week earlier he had visited Ricky Wright in Doporto's apartment while Wright babysat for Doporto.[FN6]

> FN6. Defendant subsequently identified Ricky Wright as Doporto's regular babysitter.

A few days after the murder, another sheriff's deputy interviewed defendant. During this interview defendant stated he had met with

Ricky Wright in defendant's apartment, not Doporto's. He denied ever being in Doporto's apartment.

The following day sheriff's deputies arrested defendant, advised him of his *Miranda* rights, and interviewed him again. Defendant said he had talked to Doporto on several occasions. Again, he denied being in the apartment the night of the murder. Defendant began to sob "uncontrollably" and the deputy cut the interview short.

Deputies interviewed defendant again late that evening. During the interview, defendant told them he purchased a pack of Salem brand cigarettes after dropping off his wife at the bus station the night of the murder.[FN7] Defendant was released for lack of evidence.

> FN7.  Defendant and his wife both told sheriff's deputies that defendant usually smoked Salem cigarettes.

### Strother's Arrest

Approximately one week later, a detective took Koone to a nearby military base to see if she could identify the man she saw inside Doporto's apartment and in the laundry room. They ran across Doporto at the base. At the noncommissioned officers club in a crowd of approximately 200 people, Doporto pointed to a man named John Strother and said, "that's him."

The detective pointed in the direction of Strother and asked Koone if she saw "anybody that is familiar." When Strother turned toward them, Koone got upset, started shaking, and turned and walked away. Koone told the detective she was "certain that was the guy she saw."

Detectives arrested Strother for Ritter's murder. Strother had an airtight alibi, supported by seven witnesses who confirmed he had been with them the night of the murder. Accordingly, Strother was released.

At trial, Koone testified she identified Strother solely based on his size, five feet three inches, and race.[FN8] Koone also testified she did not become visibly shaken until she saw Strother's face.

> FN8.  Gaines is five feet eight inches tall according to the probation report.  In her statement to police, Koone estimated the stranger in Doporto's apartment was five feet six inches tall.

Detectives also showed Koone yearbooks from the local high school, since the man in the apartment said his name was Robert and he was a high school sophomore. Koone selected three photos, stating one looked the "most like" the intruder.

5

Sheriff's deputies also interviewed 15-year-old Craig Neall after he was seen looking over a fence near Ritter's apartment in the early morning hours the day after the murder. Neall, who lived in the complex near Doporto's apartment, told the deputies he had been walking his dog and had ducked down because dogs were not allowed in the apartment complex. Neall's shoes and the bottom of his pants were damp, and he appeared to have dressed in a hurry. Neall's father confirmed that he had told his son to walk the dog.

Michelle Clendenin, the tenant of an apartment a few doors away from Doporto's apartment, was also interviewed in the early morning hours after Ritter's body was found. Clendenin stated she had been awakened an hour earlier by someone knocking on her door. When she opened the door, she saw a male Negro walking away. The man was approximately five feet eight inches tall. He turned and asked her what was going on. She recognized him as a previous resident of the apartment complex.

A deputy sheriff came by and asked if "they lived there." The man falsely stated that he did. After the deputy left, the man asked if he could come in. Clendenin refused, and the man told her, "I am not going to kill you or anything." The man continued to try to talk his way into the apartment. Clendenin again refused and slammed the door. Clendenin described the man as 30 years old and weighing about 175 pounds.

After Strother's release, the case went dormant. All property taken from the murder scene was logged into the sheriff's department property warehouse. This included the three cigarette butts found on the floor.

**Frances D. Assault**

Three years after Ritter's murder, defendant assaulted 20-year-old Frances D. Defendant offered Frances a ride as she walked home from a friend's house. Defendant drove her to a deserted parking lot and offered her $20 to have sex with him. When Frances refused, defendant knocked her to the ground, beat her savagely, and began choking her.

Frances's screams attracted the attention of Dr. Kenneth Ozawa and his family, who had pulled into the parking lot. Ozawa happened to be Frances's physician, and the parking lot was adjacent to medical buildings he owned. Ozawa activated his high beams and drove toward the only other car in the parking lot, beside which a man crouched. The man jumped up, got inside the car, and sped away. Ozawa managed to note the license number.

Ozawa found Frances on the ground, seriously injured. Frances's eye socket was broken and she required facial reconstruction.

Questioned by sheriff's deputies later that evening, defendant told them he had been home all night, except for a brief trip to the market with his wife and children. However, defendant's wife stated she had not gone to the market with him, although their children had. When confronted with this discrepancy, defendant admitted lying. An examination of defendant's car revealed blood spots and smears. Pine needles found inside the car matched those found at the crime scene.

The deputies arrested defendant. In a later interview, defendant said Frances "reached her hand down into a bundle she was carrying and demanded money." Defendant hit Frances and pulled her out of the car to defend himself. Defendant denied intending to commit any "sexual acts against the victim's wishes." Defendant was tried and convicted for the assault.[FN9]

> FN9. In 2006, when questioned about the assault and whether the victim had a weapon, defendant said she "pulled something out of her purse." Defendant struck Frances in reaction to what he believed was a threat.

**The Case Reopens**

In 2006 the sheriff's department reopened the investigation of Ritter's murder. Detectives reexamined physical evidence and tested it against reference samples from defendant and Ricky Wright, Doporto's regular babysitter.

Koone ruled out Wright as the man in Doporto's apartment the night Ritter was killed. However, Wright had been involved in a child molestation case in the 1980's, which caused the detectives to give him a second look.[FN10]

> FN10. Wright was convicted in 1986 for lewd and lascivious acts upon his five-year-old son. He was convicted in 2006 for lewd and lascivious acts upon two other minors. It was stipulated that shortly after the murder, detectives interviewed an individual who provided a verified alibi for Wright for the time of the murder.

Analysts at the Serological Research Institute analyzed the DNA found on two hairs and three cigarette butts found at the murder scene. Mitochondrial DNA, the DNA inherited through the maternal line, can be traced to all maternal descendents. Mitochondrial DNA is useful when samples are degraded and cannot be tested for nuclear DNA.

The analysis of the two hairs yielded no mitochondrial DNA results. Two of the three cigarette butts did not have sufficient DNA for nuclear testing. One of the two cigarette butts yielded enough mitochondrial DNA to test. The DNA did not match either

1    defendant or Ricky Wright.

2    The third cigarette butt contained enough nuclear DNA to test.
     Nuclear DNA can produce results that are exclusive to only one
3    person or that person's identical twin. The nuclear DNA testing
     ruled out Wright. However, at every point where a comparison
4    could be done, the DNA on the cigarette butt matched defendant's
     DNA sample. This profile proved to be such a rare one that the
5    chances of a match with any person other than defendant were in
     the quadrillions.

6
     Defendant did not testify. The defense offered a series of
7    stipulations and the videotape recording of an interview of
     defendant.

8
     **Verdict and Sentence**
9
     After eight days of deliberations, the jury found defendant guilty of
10   murder. The court sentenced him to life in prison with the
     possibility of parole.

11

12   *See People v. Gaines*, No. C057255, 2009 WL 3688084, at 1-5 (Cal. Ct. App. 3rd Dist. 2009).

13                          III.  GROUNDS FOR RELIEF

14           Gaines asserts five grounds for relief.  He challenges the constitutionality of his

15   conviction on the following grounds:

16           A.     Substantial delay in the filing of charges;

17           B.     Evidentiary admission of his prior sexual assault conviction;

18           C.     The prosecutor's refusal to request and obtain judicial use immunity for witness

19                  Ricky Wright;

20           D.     Non-admission of Ricky Wright's prior statement; and

21           E.     Denial of Gaines's post-verdict *Marsden* motion to substitute counsel.

22           For the reasons that follow, these grounds are without merit and the petition

23   should be denied.

24                   IV.  APPLICABLE LAW FOR FEDERAL HABEAS CORPUS

25           An application for writ of habeas corpus by a person in custody under judgment of

26   a state court can be granted only for violations of the Constitution or laws of the United States.

                                              8

1    28 U.S.C. § 2254(a); *see also Peltier v. Wright*, 15 F.3d 860, 861 (9th Cir. 1993); *Middleton v.*

2    *Cupp*, 768 F.2d 1083, 1085 (9th Cir. 1985) (citing *Engle v. Isaac*, 456 U.S. 107, 119 (1982)).

3    This petition for writ of habeas corpus was filed after the effective date of, and thus is subject to,

4    the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA").  *Lindh v. Murphy*, 521

5    U.S. 320, 326 (1997); *see also Weaver v. Thompson*, 197 F.3d 359 (9th Cir. 1999).  Under the

6    AEDPA, federal habeas corpus relief is also precluded for any claim decided on the merits in

7    state court proceedings unless the state court's adjudication of the claim:

8            (1) resulted in a decision that was contrary to, or involved an
             unreasonable application of, clearly established Federal law, as
9            determined by the Supreme Court of the United States; or

10           (2) resulted in a decision that was based on an unreasonable
             determination of the facts in light of the evidence presented in the
11           State court proceeding.

12   28 U.S.C. § 2254(d); see also *Penry v. Johnson*, 532 U.S. 782, 792-93 (2001); *Williams v.*

13   *Taylor*, 529 U.S. 362, 402-03 (2000); *Lockhart v. Terhune*, 250 F.3d 1223, 1229 (9th Cir. 2001).

14           This court looks to the last reasoned state court decision to determine whether the

15   law applied to a particular claim by the state courts was contrary to the law set forth in the cases

16   of the United States Supreme Court or whether an unreasonable application of such law has

17   occurred.  *Avila v. Galaza*, 297 F.3d 911, 918 (9th Cir. 2002), cert. dismissed, 538 U.S. 919.  The

18   state court's factual findings are presumed correct if not rebutted with clear and convincing

19   evidence.  28 U.S.C. § 2254(e)(1); *Taylor v. Maddox*, 336 F.3d 992, 1000 (9th Cir. 2004).  It is

20   the habeas corpus petitioner's burden to show the state court's decision was either contrary to or

21   an unreasonable application of federal law.  *Woodford v. Visciotti*, 537 U.S. 19, 25 (2002).

22                                        V.  DISCUSSION

23           A.       Delay in Filing Charges

24           Gaines claims his right to due process of law was violated by the pre-charge delay

25   of more than three decades.  In support of this ground, he contends that the prosecutor was

26   negligent in not charging him earlier because there was no justification for the extensive delay.

1   Gaines contends the delay prejudiced him because (1) his memory was so impaired by the time

2   of trial that he could not effectively testify on his own behalf, a circumstance that was

3   exacerbated by the prosecutor's argument that his lack of recollection was feigned and showed

4   consciousness of guilt; and (2) several witnesses died or could no longer be located.

5          A lengthy pre-indictment delay does not violate the Speedy Trial Clause of the

6   Sixth Amendment.  *United States v. Marion*, 404 U.S. 307 (1971).  This is because only "a

7   formal indictment or information or else the actual restraints imposed by arrest and holding to

8   answer a criminal charge... engage the particular protections of that provision."  *Id*. at 320.

9   Statutes of limitations provide the primary guarantee against prosecutorial delay and the bringing

10  of stale charges.  *Marion*, 404 U.S. at 322 (quoting *United States v. Ewell*, 383 U.S. 116, 122

11  (1966).)

12         Statutes of limitations do not, however, define the full scope of a defendant's right

13  to have charges promptly brought.  The Due Process Clause also "has a limited role to play in

14  protecting against oppressive delay."  *United States v. Lovasco*, 431 U.S. 783, 789 (1977).  A due

15  process inquiry into pre-indictment delay "must consider the reasons for the delay as well as the

16  prejudice to the accused."  *Lovasco*, 431 U.S. at 790.  "[P]roof of prejudice is generally a

17  necessary but not sufficient element of a due process claim."  *Id*.

18         "[T]he Due Process Clause does not permit courts to abort criminal prosecutions

19  simply because they disagree with a prosecutor's judgment as to when to seek an indictment."

20  *Lovasco*, 431 U.S. at 790.  "Judges are not free, in defining "due process," to impose on law

21  enforcement officials our "personal and private notions" of fairness and to "disregard the limits

22  that bind judges in their judicial function."  *Id*. (quoting *Rochin v. California*, 342 U.S. 165, 170

23  (1952)).  Rather, the Supreme Court has explained

24         Our task is more circumscribed.  We are to determine only whether
        the action complained of... violates those "fundamental
25         conceptions of justice which lie at the base of our civil and
        political institutions," *Mooney v. Holohan*, 294 U.S. 103, 112, 55
26         S.Ct. 340, 342, 79 L.Ed. 791 (1935), and which define "the

1
                    community's sense of fair play and decency," *Rochin v. California*,
                    supra, 342 U.S. at 173, 72 S.Ct. at 210.
2

3    *Lovasco*, 431 U.S. at 790.

4              In *Lovasco*, the Supreme Court thoroughly examined the policy reasons for not

5    requiring, as a constitutional mandate, that a prosecutor bring charges as soon as probable cause

6    has been established.  The *Lovasco* Court rejected the argument that the government is

7    constitutionally required to file prompt charges once it has assembled sufficient evidence to

8    prove guilt beyond a reasonable doubt.  *Id*. at 791-92.  Several reasons were identified for

9    allowing considerable latitude in the timing of commencement of prosecution:

10                   First, compelling a prosecutor to file public charges as soon as the
                    requisite proof has been developed against one participant on one
11                  charge would cause numerous problems in those cases in which a
                    criminal transaction involves more than one person or more than
12                  one illegal act.  In some instances, an immediate arrest or
                    indictment would impair the prosecutor's ability to continue his
13                  investigation, thereby preventing society from bringing
                    lawbreakers to justice.  In other cases, the prosecutor would be able
14                  to obtain additional indictments despite an early prosecution, but
                    the necessary result would be multiple trials involving a single set
15                  of facts.  Such trials place needless burdens on defendants, law
                    enforcement officials, and courts.
16
                    Second, insisting on immediate prosecution once sufficient
17                  evidence is developed to obtain a conviction would pressure
                    prosecutors into resolving doubtful cases in favor of early and
18                  possibly unwarranted prosecutions.  The determination of when the
                    evidence available to the prosecution is sufficient to obtain a
19                  conviction is seldom clear-cut, and reasonable persons often will
                    reach conflicting conclusions... Even if a prosecutor concluded that
20                  the case was weak and further investigation appropriate, he would
                    have no assurance that a reviewing court would agree.  To avoid
21                  the risk that a subsequent indictment would be dismissed for
                    preindictment delay, the prosecutor might feel constrained to file
22                  premature charges, with all the disadvantages that would entail.

23                  Finally, requiring the Government to make charging decisions
                    immediately upon assembling evidence sufficient to establish guilt
24                  would preclude the Government from giving full consideration to
                    the desirability of not prosecuting in particular cases.  The decision
25                  to file criminal charges, with the awesome consequences it entails,
                    requires consideration of a wide range of factors in addition to the
26                  strength of the Government's case, in order to determine whether

1
2
3

> prosecution would be in the public interest.  Prosecutors often need more information than proof of a suspect's guilt, therefore, before deciding whether to seek an indictment... Requiring prosecution once the evidence of guilt is clear [ ] could prevent a prosecutor from awaiting the information necessary for such a decision.

4   *Lovasco*, 431 U.S. at 793-95.  The Supreme Court concluded:

5
6
7
8
9
10
11
12
13

> We would be most reluctant to adopt a rule which would have these consequences absent a clear constitutional command to do so.  We can find no such command in the Due Process Clause of the Fifth Amendment.  In our view, investigative delay is fundamentally unlike delay undertaken by the Government solely "to gain tactical advantage over the accused," *United States v. Marion*, 404 U.S., at 324, 92 S.Ct., at 465, precisely because investigative delay is not so one-sided.  Rather than deviating from elementary standards of "fair play and decency," a prosecutor abides by them if he refuses to seek indictments until he is completely satisfied that he should prosecute and will be able promptly to establish guilt beyond a reasonable doubt.  Penalizing prosecutors who defer action for these reasons would subordinate the goal of "orderly expedition" to that of "mere speed," *Smith v. United States*, 360 U.S. 1, 10, 79 S.Ct. 991, 997, 3 L.Ed.2d 1041 (1959).  This the Due Process Clause does not require.

14   *Lovasco*, 431 U.S. at 795-96.

15   Thus, "to prosecute a defendant following investigative delay does not deprive

16   him of due process, even if his defense might have been somewhat prejudiced by the lapse of

17   time." *Lovasco*, 431 U.S. at 796.  It is not enough to show that the prosecution could have

18   proceeded more rapidly or that there was some period of delay in which no additional

19   investigation was taking place.  *See United States v. Walker*, 601 F.2d 1051, 1056 (9th Cir.

20   1979).  "Pre-indictment delay is permissible unless it violates 'fundamental conceptions of

21   justice which lie at the base of our civil and political institutions'." *Id*. (quoting *Arnold v.

22   McCarthy*, 566 F.2d 1377 (9th Cir. 1978).  The prosecution may not, however, intentionally

23   delay in commencing prosecution for the purpose of obtaining a tactical advantage, to the

24   prejudice of the accused, or delay in reckless disregard of known circumstances suggesting that

25   delay would impair the ability to mount an effective defense.  *Walker*, 601 F.2d at 1056 (citing

26   *Lovasco*, 431 U.S. at 795, n.17).

1    In this case, Gaines first raised the issue of pre-indictment delay in a pre-trial

2    motion to dismiss.  The trial court deferred ruling until after the trial and then denied the motion

3    in a post-verdict hearing.  The trial court found Gaines had failed to establish prejudice since he

4    did not show evidence had been lost or that he was unable to pursue a line of investigation that

5    might have led to exculpatory evidence.  The court also concluded there was no evidence the

6    prosecution delayed for tactical advantage.  The court held that even if the delay was prejudicial,

7    there was compelling and powerful evidence that it was justified: until 2003 no DNA test existed

8    that could test the minute quantity of DNA on the cigarette butt.  The cigarette butt was tested in

9    2006 and the three-year delay was justified by the large backlog of cases in which testing needed

10   to be done.

11   On appeal, the California Court of Appeal agreed that the delay prejudiced Gaines

12   but nevertheless upheld the trial court's ruling:

> Defendant argues the long delay in filing charges against him prejudiced him because of both his own memory loss and the death of several potential witnesses. We find merit in defendant's contentions.
>
> The prosecution, in closing argument, underscored defendant's lack of memory in his 2006 interview, in which he stated he couldn't recall statements made in 1972. According to the prosecution's argument, defendant's lack of memory reflected either a guilty conscience or a lack of truthfulness.[FN11] It is possible that the three decades between the initial interview in 1972 and the interview in 2006 affected defendant's ability to remember, an impact prejudicial to defendant's case.
>
>> FN11. In the 2006 interview, which the prosecution played for the jury, defendant did not recall ever going into Doporto's apartment, nor did he remember Ricky Wright. Defendant did not recall being arrested, being cited for shoplifting, or smoking cigarettes, except "maybe" some of his wife's.
>
> Not surprisingly, the passage of time also saw the passage of several witnesses in the case. In particular, Doporto, who hired Ritter to babysit and who incorrectly pointed out Strother at the base, died prior to trial. The death of a material witness may constitute prejudice. (*Boysen, supra,* 165 Cal.App.4th at pp. 778-780.) [FN12]

13

FN12. The People contend defendant offers "only speculation" about what Doporto might have testified to. However, Doporto had knowledge of Wright, who babysat for her on various occasions. Doporto might have corroborated defendant's statement that he had visited Wright in Doporto's apartment. Such testimony would have suggested a less sinister explanation for defendant's DNA on the cigarette butt found in Doporto's apartment.

Doporto's death, coupled with alleged gaps in defendant's memory of the events surrounding the murder, constitutes prejudice stemming from the lengthy delay between the murder and defendant's arrest and trial. Since the delay prejudiced defendant, we balance the People's justification for the delay against the prejudice to defendant.

Defendant contends the People cannot justify the delay, since the evidence on which they relied was available years or decades earlier. First, defendant argues his arrest in the 1975 assault was even more probative than the DNA found on the cigarette butts. The 1975 incident showed a common plan or scheme in the method of attack: both Ritter and Frances D. were strangled. According to defendant, the 1975 incident, in conjunction with the statement by eyewitness Koone and the other evidence obtained in 1972, "provided all that was needed to rearrest" defendant.

We are not persuaded by defendant's construct of the evidence against him. While defendant's 1975 attack on Frances D. provided evidence of his predilection to violence, more is required to show the prosecution's delay was unjustified.

"In balancing prejudice and justification, it is important to remember that prosecutors are under no obligation to file charges as soon as probable cause exists but before they are satisfied that guilt can be proved beyond a reasonable doubt or before the resources are reasonably available to mount an effective prosecution. Any other rule 'would subordinate the goal of orderly expedition to that of mere speed.' [Citation.]" (*Boysen, supra,* 165 Cal.App.4th at p. 777.) As compelling as the 1975 attack might have been to indicate defendant's tendency toward violence, it by no means provided assurance that defendant's guilt of Ritter's murder could be proved beyond a reasonable doubt.

The People filed charges against defendant after DNA testing of evidence found at the murder scene. However, according to defendant, this evidence was available three years earlier, in 2003. Therefore, the three-year delay in testing was unreasonable.

We disagree. Prior to deciding defendant's motion, the trial court considered the declaration of the prosecution's DNA expert. The

14

1      expert stated that prior to 2003, DNA testing could not be
    performed on a minute quantity of DNA in a mixed, degraded
2      sample such as that found on the cigarette butts in Doporto's
    apartment. Testing prior to 2003 would not have been definitive.
3      The cigarette butts were not tested until 2006 because of the
    tremendous backlog in cases to be tested using the more accurate
4      method. Such a delay, given the circumstances, was not unreasonable.

5      [¶] .... Here, although the delay resulted in prejudice to defendant,
    this prejudice was outweighed by the justification for the delay.
6      We find no error.

7  *People v. Gaines*, 2009 WL 3688084, at 11-12.

8         Gaines offers no evidence that the delay in his case was the result of improper

9  motivation by the prosecution.  For this reason and the others discussed, the state court's decision

10  that the pre-indictment delay he experienced did not violate fundamental conceptions of justice is

11  not contrary to, or an unreasonable application of Supreme Court precedent.  *See Lovasco*, 431

12  U.S. at 796 ("to prosecute a defendant following investigative delay does not deprive him of due

13  process, even if his defense might have been somewhat prejudiced by the lapse of time").

14               B.      Prior Sexual Assault Conviction

15         Following Gaines's preliminary hearing, the prosecutor filed an amended

16  information charging him with Ritter's murder.  The amended information included an allegation

17  that the murder was willful, deliberate, and premeditated, and committed in the perpetration or

18  the attempted perpetration of a lewd or lascivious act upon a child.

19         The defense filed a motion to dismiss the special allegation, arguing there was no

20  evidence of a lewd or lascivious act or attempted act on Ritter in connection with her murder.  At

21  a hearing on the motion, the parties discussed the ramification of the court's ruling on this issue

22  as to the admissibility of Gaines's prior sexual assault conviction under sections 352 and 1108 of

23  the California Evidence Code.  Under section 1108, propensity evidence of a prior sexual

24  offense[1] is admissible against a criminal defendant charged with a sexual offense, unless

25  _____

26       [1] A crime that involves lewd and lascivious acts with a child under the age of 14 is an
enumerated "sexual offense" in this section.  *See* Cal. Evid. Code §§ 288a, 1108.

1    otherwise inadmissible pursuant to section 352 of the Code.  Section 352, in turn, allows the

2    court in its discretion to exclude evidence if its probative value is substantially outweighed by the

3    probability that its admission will necessitate undue consumption of time or create substantial

4    danger of undue prejudice, of confusing the issues, or of misleading the jury.

5          The trial court found that sufficient evidence at the preliminary hearing supported

6    a finding that the murder was committed during the commission of a lewd or lascivious act upon

7    a child and denied the motion to dismiss.  This evidence included the fact that there was no

8    preexisting relationship between Gaines and Ritter, that Ritter's clothes appeared to have been

9    forcibly removed, and the unusual mark on Ritter's breast, which the court found was consistent

10   with sexual assault.

11         At trial, Gaines objected to the evidence concerning his assault on Frances D. as

12   overly prejudicial.  The court overruled the objection and allowed the evidence.

13         In the last reasoned state court decision applicable to this claim, the appellate

14   court set forth a lengthy analysis of the applicable state law, ultimately concluding that section

15   1108 applied to Gaines's case and that "although the balance of probative value against

16   prejudicial impact may be close," the trial court's ruling was neither arbitrary nor capricious and

17   should not be disturbed.  *See People v. Gaines*, *supra*, 2009 WL 3688084, at 7-10.

18         Gaines claims here that the evidentiary admission of his past sexual assault

19   conviction, used to show his propensity to commit sexual offenses, violated his right to due

20   process of law.  He argues, as he did in state court, that the probative value was minimal since

21   there was little evidence that Ritter's murder was motivated by sex.

22         To the extent Gaines asserts merely an error in the application of sections 352 and

23   1108, that is an issue of state evidentiary law for which habeas corpus relief will not lie.  *See,*

24   *e.g.*, *Estelle v. McGuire*, 502 U.S. 62, 68 (1991); *Crane v. Kentucky*, 476 U.S. 683, 689 (1986)

25   ("We acknowledge also our traditional reluctance to impose constitutional constraints on

26   ordinary evidence rulings by state trial courts."); *Henry v. Kernan*, 197 F.3d 1021, 1031 (9th Cir.

1   1999), cert. denied, 528 U.S. 1198 (2000).  A state court's evidentiary ruling, even if erroneous,

2   is grounds for federal habeas corpus relief only if it rendered the state proceedings so

3   fundamentally unfair as to violate due process. *See generally Williams v. Taylor,* 529 U.S. 362,

4   375 (2000); *see also Drayden v. White*, 232 F.3d 704, 710 (9th Cir. 2000); *Spivey v. Rocha*, 194

5   F.3d 971, 977-78 (9th Cir. 1999); *Jammal v. Van de Kamp*, 926 F.2d 918, 919 (9th Cir. 1991).

6          The United States Supreme Court has acknowledged that "rules concerning

7   evidence of prior offenses are complex, and vary from jurisdiction to jurisdiction."  *Spencer v.*

8   *Texas*, 385 U.S. 554, 560 (1967).  Such evidence is often excluded except under various

9   circumstances and exceptions.  *Id*. at 560-61.  "The defendant's interests are protected by

10  limiting instructions... and by the discretion residing with the trial judge to limit or forbid the

11  admission of particularly prejudicial evidence even though admissible under an accepted rule of

12  evidence."  *Id*. at 561.

13         The specific question whether the admission of evidence of prior crimes or

14  propensity evidence in general violates due process appears to be an open question in the

15  Supreme Court's jurisprudence.  *See Estelle*, 502 U.S. at 75 n.5 ("[W]e express no opinion on

16  whether a state law would violate the Due Process Clause if it permitted the use of 'prior crimes'

17  evidence to show propensity to commit a charged crime."); *Alberni v. McDaniel*, 458 F.3d 860,

18  866-67 (9th Cir. 2006) (noting that the Supreme Court has denied certiorari at least four times on

19  the propensity evidence issue reserved in *McGuire*), *cert. denied*, 549 U.S. 1287 (2007).

20         In *Holley v. Yarborough*, 568 F.3d 1091, 1101 (9th Cir. 2009), the Ninth Circuit

21  explained:

22         Under AEDPA, even clearly erroneous admissions of evidence that
           render a trial fundamentally unfair may not permit the grant of
23         federal habeas corpus relief if not forbidden by "clearly established
           Federal law," as laid out by the Supreme Court. 28 U.S.C. §
24         2254(d). In cases where the Supreme Court has not adequately
           addressed a claim, this court cannot use its own precedent to find a
25         state court ruling unreasonable. *Musladin*, 549 U.S. at 77, 127
           S.Ct. 649.

26

> The Supreme Court has made very few rulings regarding the admission of evidence as a violation of due process. Although the Court has been clear that a writ should be issued when constitutional errors have rendered the trial fundamentally unfair, *see Williams,* 529 U.S. at 375, 120 S.Ct. 1495, it has not yet made a clear ruling that admission of irrelevant or overtly prejudicial evidence constitutes a due process violation sufficient to warrant issuance of the writ. Absent such "clearly established Federal law," we cannot conclude that the state court's ruling was an "unreasonable application." *Musladin,* 549 U.S. at 77, 127 S.Ct. 649.

*Holley*, 568 F.3d at 1101.  In *Holley*, despite finding that "the trial court's admission of the pornographic materials resulted in a trial that was fundamentally unfair and would warrant issuance of the writ under our precedent," the Ninth Circuit held it was without power to issue the writ under the strict standards of AEDPA based on the lack of Supreme Court precedent.  *Id.*

Since the right Gaines asserts- to be free from admission of prejudicial evidence of prior bad acts- has not been clearly established by the Supreme Court as required by AEDPA, relief cannot be granted.  *See* 28 U.S.C. § 2254(d); *Alberni*, 458 F.3d at 867; *accord Mejia v. Garcia*, 534 F.3d 1036, 1046 (9th Cir. 2008) (reaffirming *Alberni*).

C.   Judicial Use Immunity to Witness Wright

When called by the defense as a witness at trial, Ricky Wright immediately invoked his Fifth Amendment privilege against self-incrimination.  Wright's attorney indicated that the basis for the invocation was the possibility of his testimony being used against him in a future prosecution for Ritter's murder since Wright had previously been a suspect.  The trial court found Wright's invocation of his Fifth Amendment right proper but agreed to reconsider the issue after briefing by the parties.  The parties submitted briefing.  The defense filed, and the trial court denied, a motion for judicial use immunity.

/////

In 1972, Wright told police that Gaines had been in Doporto's apartment three days before Ritter's murder, when "he entered the apartment and just stood by the door" and then left after 10 minutes; Wright also said Gaines was one of the people who "walked right in [to

1   Doporto's apartment] when they felt like it." *People v. Gaines*, *supra*, 2009 WL 3688084, at 13

2   n.13.  The significance, of course, is that Gaines's presence in the apartment could explain the

3   cigarette butt with his DNA on it.

4                In denying the defense's motion for judicial use immunity, the trial court

5   explained that use immunity must be requested by the prosecution, not the defense. The court

6   further noted it was undisputed that the prosecution was not intentionally trying to distort the

7   fact-finding process by not giving Wright immunity, and that Wright's testimony would not

8   exculpate Gaines.  In this regard, the trial court found Wright's testimony cumulative of other

9   evidence and also likely to result in the admission of additional testimony damaging to the

10  defense.  The testimony was cumulative because the jury heard that Gaines told police he had

11  been in Doporto's apartment about a week before the murder.  Moreover, if Wright testified,

12  Wright could be asked about his statement that Gaines "paid attention to young girls in a sexual

13  way in the sense that he would comment to the effect such things as he wished they were older."

14  *People v. Gaines*, 2009 WL 3888084, at 13.

15               Under California law, the defense does not have a right to obtain immunity for a

16  defense witness over the prosecution's objections.  *Daly v. Superior Court*, 19 Cal.3d 132, 146

17  (1977).  Several federal courts of appeal, including the Ninth Circuit, have recognized that a due

18  process violation may occur where the prosecution distorts the judicial fact finding process by

19  denying immunity to a defense witness.  *See, e.g.,United States v. Lord*, 711 F.2d 9887, 892 (9th

20  Cir. 1983); *see also Jeffers v. Ricketts*, 832 F.2d 476, 479 (9th Cir. 1987), *rev'd on other*

21  *grounds*, 497 U.S. 764, 110 S.Ct. 3092 (1990). Circuit precedent does not, however, constitute

22  clearly established Federal law for AEDPA purposes.  *Byrd v. Lewis*, 566 F.3d 855, 860 n.5 (9th

23  Cir. 2009).  A thorough search reveals no United States Supreme Court precedent setting forth

24  any circumstances under which trial court denies a criminal defendant his right to a fair trial by

25

26

1    not granting witness immunity, even to a material defense witness.[2]  Due to the lack of applicable

2    clearly established Supreme Court precedent, no relief is available.  *See* 28 U.S.C. § 2254(d).

3                   Moreover, the California Court of Appeal's resolution of this claim is consistent

4    with Ninth Circuit precedent.  Under Ninth Circuit precedent, a criminal defendant has a due

5    process claim based on the denial of witness immunity where the fact-finding process was

6    distorted by prosecutorial misconduct that kept out relevant evidence, thereby denying the

7    defendant a fair trial.  *United States v. Westerdahl*, 945 F.2d 1083, 1086 (9th Cir. 1991) (citing

8    *Lord*, 711 F.2d at 892); *see also Jeffers*, 832 F.2d at 479.  As the state court set forth, in this case,

> Wright's testimony would have corroborated defendant's statement that he was in Doporto's apartment on occasions other than the night of the murder. However, Wright's testimony would also have introduced defendant's attentiveness to young girls and comments about them. On balance, the trial court did not err in denying defendant's motion. Wright's testimony about defendant's presence in the apartment, while relevant, basically corroborated defendant's own testimony. In contrast, Wright's testimony about defendant's interest in young girls significantly bolstered the prosecution's case against defendant. Given the dual nature of Wright's testimony, we cannot find the prosecution "distorted the judicial fact-finding process by denying immunity to the potential witness." (*Westerdahl, supra,* 945 F.2d at p. 1086.)

16    *People v. Gaines*, 2009 WL 3688084, at 14.

17                  In addition, the denial of use immunity is subject to harmless error review.  *See*

18    *United States v. Young*, 86 F.3d 944, 949 (9th Cir. 1996); *United States v. Baker*, 10 F.3d 1374,

19    1415 (9th Cir. 1993) (overruled on other grounds).  On federal habeas corpus review, relief

20    cannot be granted unless the error had a "substantial and injurious effect or influence in

21    determining the jury's verdict."  *Calderon v. Coleman*, 525 U.S. 141, 147 (1998) (citing *Brecht*

22    *v. Abrahamson*, 507 U.S. 619, 637 (1993)).  Given the dual nature of the testimony Wright's

---

[2] Supreme Court precedent clearly establishes that the government cannot substantially interfere with a defense witness's decision to testify with threats or coercive language. *See Webb v. Texas*, 409 U.S. 95, 97-98 (1972) (per curiam) (trial judge's "lengthy and intimidating warning" and "threatening remarks" effectively caused the defendant's only witness not to testify in violation of due process)). It does not clearly flow from *Webb*, however, that denial of judicial use immunity can violate due process.

1 potential testimony, the trial court's denial of use immunity did not have substantial and injurious

2 effect or influence in determining the jury's verdict.

3             D.     Wright's Prior Statement

4          In a related claim, Gaines contends the trial court, after denying the defense's

5 request for judicial use immunity, improperly refused to admit Wright's prior statement about

6 Gaines's presence in Doporto's apartment on a previous occasion.  Citing *Chambers v.*

7 *Mississippi*, 410 U.S. 284 (1973) (holding that the exclusion of crucial defense evidence can

8 violate a criminal defendant's right to due process), Gaines claims the trial court's error violated

9 his constitutional rights to a fair trial, to present a defense, to confrontation, and due process.

10          Contrary to Gaines's assertion that the trial court improperly refused to admit the

11 evidence, the defense never sought to have the evidence admitted.  This fact was explicitly

12 determined by the state appellate court, is supported by the record, and has not been refuted with

13 clear and convincing evidence.  *See People v. Gaines*, 2009 WL 3688084, at 15.  This ground

14 lacks merit.

15             E.     Post-Trial *Marsden* Motion

16          Following the verdict, Gaines filed a motion for new trial alleging ineffective

17 assistance of counsel.  Trial counsel expressed his belief that there were no grounds for a new

18 trial motion.  Gaines moved for appointment of new counsel and the court held a hearing.

19 Gaines contends here that the court made an error of constitutional magnitude when it did not

20 grant the motion so that newly appointed counsel could file a motion for new trial based on

21 defense counsel's alleged ineffective assistance in failing to arrange for DNA testing of six hairs

22 found on Ritter's body.  The six hairs at issue were reddish brown, Caucasian head hairs that

23 were inconsistent with the hair of Ritter, Gaines, or Wright.

24          Pursuant to *People v. Marsden*, 2 Cal. 3rd 118 (1970), when a criminal defendant

25 in California asserting inadequate representation seeks to discharge appointed counsel and

26 substitute another attorney, the trial court must permit him to explain the basis of his contention

and to relate specific instances of the attorney's inadequate performance.  *People v. Memro*, 11 Cal.4th 786, 857 (1995) (quoting *People v. Fierro*, 1 Cal.4th 173, 204 (1991)).  Gaines contends the trial court made an error of constitutional magnitude in denying his post-trial *Marsden* motion premised on his desire to assert ineffective assistance of counsel in a motion for new trial.

The denial of a *Marsden* motion to substitute counsel can implicate a criminal defendant's Sixth Amendment right to counsel and is properly considered in federal habeas corpus.  *Bland v. California Dep't of Corrections*, 20 F.3d 1469, 1475 (9th Cir.), cert. denied, 513 U.S. 947 (1994), overruled on other grounds by *Schell v. Witek*, 218 F.3d 1017 (9th Cir. 2000) (en banc).  The relevant inquiry is whether the petitioner's Sixth Amendment right to counsel was violated.  *See Schell*, 218 F.3d at 1026.  The Sixth Amendment guarantees effective assistance of counsel, not a "meaningful relationship" between an accused and his counsel.  *See Morris v. Slappy*, 461 U.S. 1, 14 (1983).

There is no absolute right to substitute counsel for purposes of a new trial motion. *See generally United States v. Del Muro*, 87 F.3d 1078, 1080, 1081 n.4 (9th Cir. 1996) (holding that substitute counsel is required where an actual, irreconcilable conflict exists but declining to decide whether a defendant would be entitled to substitute counsel under other circumstances).  It further appears that the Supreme Court has not specifically addressed the level of inquiry required when a *Marsden* motion or similar motion is made by a criminal defendant.  When assessing a trial court's ruling on a *Marsden* motion in the context of a federal habeas corpus proceeding, the Ninth Circuit has held that the Sixth Amendment requires only "an appropriate inquiry into the grounds of such a motion, and that the matter be resolved on the merits before the case goes forward."  *Schell*, 218 F.3d at 1025.

On direct review, the state appellate court noted the following with respect to the trial court's inquiry into the grounds of Gaines's *Marsden* motion:

/////

The trial court asked defense counsel about the lack of testing.

Defense counsel responded: "I'm at a bit of a loss. We had DNA expert counsel on that. [Defense DNA expert counsel Blasier] ... I don't have the authority on these types of cases, on the panel cases, to do anything with the DNA. We're required and mandated to have a DNA attorney and it's their preference or their determination as to what to do. However, sitting through the entire trial I don't think there was any dispute that those were Caucasian hairs and there's no way they could be [defendant's], so the DNA would never match [defendant], so having a DNA result saying they didn't match him seems to be futile to me, but, again, that would be Mr. Glasier's [*sic*] area."

Defendant argued the hairs should have been tested to ascertain to whom they belonged. Defendant told the court: "That DNA could have brought the killer. [¶] He left his hairs on the body. But we're going to dismiss it because it wasn't me. And these are very significant things, the hairs to be on her body, I think."

The court considered defendant's argument and determined: "With regard to the six hairs, Mr. Blasier is not here. The dominant evidentiary value of the hairs, of course, is that there was someone other than the defendant that was in proximity to this victim. That evidence was before the jury. [¶] There's always a strategic decision involved as to whether or not you do tests to get more information than exclusion information, that is, exclusion that it wasn't the defendant. [¶] You, for example, can do a test and then determine that the hair would be a female or some other innocent party given the sexual nature of this crime. And then instead of having evidence which is arguably exculpatory with one line of inferences, it turns out to have really no evidentiary value at all. [¶] In any event, there's not a failure rising to the level of a Marsden, failure by defense counsel in that regard. [¶] It was argued very powerfully in the closing argument. I thought it was the strongest part of the closing argument by the defense in regard to who that hair belonged to and that argument was there without further testing and without the inherent risk that further testing might eliminate the use of that. And that argument was available without further testing that might eliminate the usefulness of that argument."

Defendant acknowledges that the trial court questioned defense counsel about the lack of DNA testing of the six hairs. However, defendant faults the trial court for not questioning the DNA expert counsel, Blasier, arguing this amounted to an abuse of the court's discretion.

We disagree. Defense counsel stated Blasier was in charge of the DNA evidence. However, defense counsel also stated there was no dispute that the hairs did not belong to defendant, "so having a DNA result saying they didn't match him seems to be futile to me...."

Defendant discounts defense counsel's explanation, arguing:

"Asking for a tactical explanation of an attorney who had no responsibility to make a tactical decision is tantamount to not asking for an explanation at all. When the court learned that the decision was Blasier's, it should have arranged for Blasier to appear and respond."

We do not read a trial court's responsibility under *Marsden* so narrowly. The court is required to question counsel in order to evaluate whether defendant's claim of ineffective representation is tenable. (*People v. Panah* (2005) 35 Cal.4th 395, 432.) Here, defense counsel, while acknowledging that DNA counsel made the final decision, explained that based on "sitting through the entire trial," he believed DNA testing of the six hairs would have been futile.

The trial court accepted this explanation, noting defense counsel argued strenuously during closing argument that the six hairs, which did not belong to defendant, pointed to a third party as the murderer. As the court explained, further testing might well have destroyed defendant's ability to point to a third party as the possible culprit.

The court questioned defense counsel, obtained an explanation the court found tenable, and rejected defendant's argument on this issue. We find no abuse of discretion.

*People v. Gaines*, 2009 WL 3688084, *supra*, at 16 -17.

The trial court gave Gaines the opportunity to explain his reasons for wanting substitute counsel, asked counsel to address the alleged deficiency, and satisfied itself that counsel's representation at trial was adequate.  The record established that there was no breakdown of attorney-client communications; rather, Gaines and his attorney simply disagreed about whether there were grounds for a new trial motion.  The factual record developed was sufficient to allow the court to make an informed decision that Gaines's claim of conflict did not require substitute counsel.  *See Stenson v. Lambert*, 504 F.3d 873, 887 (9th Cir. 2007) (inquiry was adequate when court determined lines of communication were open and counsel was competent); *United States v. Prime*, 431 F.3d 1147, 1155 (9th Cir. 2005) (inquiry was adequate where defendant 'was given the opportunity to express whatever concerns he had, and the court inquired as to [defense attorney's] commitment to the case and his perspective on the degree of

1    communication."); *cf. Schell*, 218 F.3d at 1027 (remanding for evidentiary hearing where state

2    court failed to make any inquiry into alleged deterioration of attorney-client relationship and

3    substance of claims).   The trial court, having inquired into counsel's representation and satisfied

4    itself that representation was adequate, did not violate Gaines's Sixth Amendment rights in

5    denying his *Marsden* motion to substitute counsel solely for the purpose of a new trial motion

6    based on ineffective assistance of counsel.

7                                            VI.  CONCLUSION

8                 For the foregoing reasons, the petition should be denied.   Pursuant to Rule 11 of

9    the Federal Rules Governing Section 2254 Cases, this court must issue or deny a certificate of

10   appealability when it enters a final order adverse to the applicant.   A certificate of appealability

11   may issue only "if the applicant has made a substantial showing of the denial of a constitutional

12   right."  28 U.S.C. § 2253(c)(2).   A substantial showing of the denial of a constitutional right has

13   not been made in this case.

14                 Accordingly, IT IS HEREBY RECOMMENDED that:

15                 1.  The petition for writ of habeas corpus be denied; and

16                 2.  A certificate of appealability not issue.

17                 These findings and recommendations are submitted to the United States District

18   Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within twenty-

19   one days after being served with these findings and recommendations, any party may file written

20   objections with the court and serve a copy on all parties.  Such a document should be captioned

21   "Objections to Magistrate Judge's Findings and Recommendations."  Failure to file objections

22   within the specified time waives the right to appeal the District Court's order.  *Martinez v. Ylst*,

23   951 F.2d 1153 (9th Cir. 1991).  Any reply to the objections shall be filed and served within seven

24   days after service of the objections.

25   DATED: March 3, 2012                    *Charlene H. Sorrentino*

                                            CHARLENE H. SORRENTINO
26                                          UNITED STATES MAGISTRATE JUDGE